Carolyn Nota ALEXANDER, etc.,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 77–1612.

United States Court of Appeals,
Fifth Circuit.

Oct. 31, 1979.

---

Ronald R. Glancz, Michael Kimmel, Attys., Dept. of Justice, Civ. Div., App. Section, Washington, D. C., for defendant-appellant.

Lynn Cooksey, Texarkana, Tex., for plaintiff-appellee.

Before WISDOM, CLARK and GEE, Circuit Judges.

WISDOM, Circuit Judge:

This action brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (FTCA) raises the question whether the United States is liable for the death of an individual employed by an independent contractor at a munitions plant owned by the government, where the United States has instituted a significant safety program but the plant is operated by the contractor. The district court in a bench trial held that plant safety was a "joint endeavor" because of the government's safety program, and that the negligence of United States employees combined with the negligence of the decedent, John S. Alexander, in causing Alexander's accidental death. The district court, applying the Texas rule of comparative negligence, awarded damages against the United States. See Tex.Civ.Code Ann. art. 2212a (Vernon Cum.Supp.1978). We conclude that the district court was clearly erroneous in finding that plant safety was a "joint endeavor" and that negligence of United States employees was a proximate cause of Alexander's accidental death. Therefore, we reverse.

I

The decedent was employed by Day & Zimmerman, Inc. as an inspector at the Lone Star Army Ammunition Plant (Lone Star) in Bowie County, Texas. The Lone Star facility was owned by the United States, but was operated by Day & Zimmerman under a contract to load, assemble, test, and pack munitions supplies for the Department of the Army. Although Day & Zimmerman personnel manufactured the

munitions, the United States instituted and to some extent supervised safety at the plant. Under the contract, members of the United States Army and civilian employees of the government routinely conducted inspections of plant operations to insure that Day & Zimmerman complied with the contract and with safety regulations issued by the United States. In addition, government employees performed safety analyses of and approved all proposed testing and manufacturing devices and procedures before they were put into operation at the plant. The contract also authorized certain government employees to stop any activity at the plant that failed to conform to the government's safety rules.

Alexander was an assistant chief inspector for Day & Zimmerman. One of his responsibilities was to supervise detonation penetration tests and to destroy defective M46 grenades that failed to explode. The grenade testing apparatus at the plant was designed, constructed, maintained, and operated by the contractor. Mandatory safety regulations issued by the United States required Alexander to place a charge next to the faulty grenade using a special pole and lanyard while standing behind a protective steel barricade and to detonate the charge by remote control. On the day of the accident, Alexander, after having been summoned to destroy a grenade, ignored the prescribed detonation procedure and attempted to reset the firing mechanism on the testing apparatus while standing fully exposed to the grenade outside the protection of the steel barricade. Alexander reset by hand the "drop weight"—a metal pin which was designed, when remotely released by a solenoid, to fall through the "drop tube" or "drop weight hole" onto the firing pin of the grenade. Unfortunately, the holding and release mechanism for the drop weight ("solenoid safety pin") had worked loose from the solenoid. When Alexander placed the weight in the drop tube the solenoid safety pin did not, as it was meant to, hold the drop weight. The

weight dropped down to the firing pin. Alexander was killed by the resulting detonation of the grenade.

The decedent's widow brought this action under the FTCA alleging that negligence of government employees caused her husband's death. The United States is liable under the FTCA to the same extent as private parties for torts of its employees acting within the scope of their employment. 28 U.S.C. § 1346(b); *United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). The question presented to the district court was whether United States employees breached any duty owed the decedent under Texas law. 28 U.S.C. § 1346(b); *Emelwon, Inc. v. United States*, 5 Cir. 1968, 391 F.2d 9, 10. The district court found that United States employees had breached various duties recognized under Texas law and that the negligence of government employees combined with the decedent's own negligence to cause the fatal accident.[1]

The district court held that the United States was in possession and control of the Lone Star plant as a result of reserving authority to make safety inspections, to alter the design of equipment and operating procedures, and to cease performance of the contract in the event of safety violations by Day & Zimmerman personnel. The court also found that plant safety was a "joint endeavor" between the United States and Day & Zimmerman creating a duty upon the defendant to insure the safe operation of the plant and a safe place of work for the decedent. The duties of the United States to Alexander were enhanced, the district court reasoned, because of the inherently dangerous nature of the work performed by Day & Zimmerman. The district court concluded that the United States was negligent in failing to provide Alexander a safe place to work. More specifically, the district court found the government negligent in failing to discover that the grenade

---

1. The district court held that total damages resulting from Alexander's death were $300,-000. The district court found that the dece-

dent's negligence contributed 40 percent to the accident and accordingly awarded the plaintiff $180,000.

testing site was unsafe, in approving the grenade testing apparatus and the steel test barricade, and in not furnishing the decedent protective clothing, protective equipment, or operational shields. Finally, said the court, the United States was negligent in failing to conduct a system safety analysis of the testing apparatus and in approving the procedure for detonating faulty grenades.

■ On appeal, of course, this Court is limited to considering whether the district court's findings of fact were clearly erroneous. *Market Insurance Co. v. United States*, 5 Cir. 1969, 415 F.2d 459, 461. Moreover, since liability under the FTCA depends on principles of negligence under state law, we must be slow to substitute our judgment for that of the district judge who is experienced in dealing with Texas law. *See Petersen v. Klos*, 5 Cir. 1970, 433 F.2d 911, 912. Nevertheless, after scrutiny of the record we are unable to find support for the district judge's conclusion that negligence of United States employees was a proximate cause of Alexander's fatal accident.

## II

■ Since liability under the FTCA is governed by state law, we must first determine the relationship which existed between the United States and Day & Zimmerman and the duties that arose from the relationship. The contract executed by the United States and Day & Zimmerman in 1971 specifically stated that Day & Zimmerman was an "independent contractor," not an agent of the United States; no language in the contract suggests a "joint endeavor". The contract gave complete responsibility for plant operations to Day & Zimmerman.[2] Under the contract the United States reserved the right to approve the design and specifications of any item utilized in the manufacturing process at the Lone Star plant. In addition, Army safety manuals governing the plant operations required the United States to perform safety analyses of all test programs, standard operating procedures, and equipment at the munitions facility. Department of Defense regulations also dictated that government employees conduct hazard studies of all systems and equipment including consideration of fail safe designs and human error analyses of operating functions and requirements. Finally, three of the government's 124 employees at the plant had the authority to stop any activity by Day & Zimmerman personnel considered unsafe, to shut down unsafe equipment, and to discharge, subject to a dispute procedure, Day & Zimmerman personnel for reasons of misconduct or security. Although United States employees conducted these various safety monitoring functions, the parties "agree[d] and recognize[d] that the plant [was] turned over to the contractor".[3] Moreover, Day & Zim-

2. Article E–2 of the contract entered into by Day & Zimmerman and the United States in 1971, provides in part that:

> [Day & Zimmerman], as an independent contractor and not as an agent of the Government, shall furnish all personnel, labor, equipment, supplies, materials, consultation, engineering and other services, except such of the foregoing as may be furnished by the Government, sufficient and adequate to operate and maintain the Lone Star Army Ammunition Plant. . . . [Day & Zimmerman] shall perform. . . .
>
> A. Operation of the plant, within its capacity, for loading, assembly, packaging of ammunition and components thereof.
> . . .
> b. Training or [sic] personnel at the plant.
> . . .
> e. Preparation and submission of designs, drawings and specifications for any item

required in the manufacturing process, all as may be requested or approved by the Contracting officer. . . .

> j. Maintenance of the plant and portions thereof. . . .
> k. Performance of such other work and services as the plant is or may be designed and equipped to support. . . .

3. Article J–10 of the contract executed by Day & Zimmerman and the United States in 1971 provides:

> It is the understanding and intent of the Contracting parties that the Contractor shall utilize AMCR 385–100, Safety Manual, dated April 1970, as the implementation instructions for the safety requirements under this Contract. The Contractor shall also comply with all applicable provisions of local, State and Federal ordinances, laws and building

merman had its own contingent of safety supervisors among its 3,200 Lone Star employees.

The district court held that because of the supervision exercised by the United States under the contract, plant safety was a "joint endeavor" between Day & Zimmerman and the United States. The term "joint endeavor" comes from *Martin v. United States*, No. 794 (E.D.Tex. Aug. 7, 1964), *aff'd per curiam*, 5 Cir. 1966, 354 F.2d 686, a similar case involving the same plant, decided by the same district judge who decided the case now before us. In *Martin* this Court affirmed per curiam the district court decision allowing recovery by an injured employee of Day & Zimmerman under the FTCA on the theory that the United States "assumed the responsibility of safety [at the Lone Star plant] as a joint venture, as set forth in the contract" with Day & Zimmerman. *Martin v. United States*, No. 794, unpub. op. at 3 (E.D.Tex. Aug. 7, 1964). A crucial distinction between this case and the *Martin* case that was not recognized by the district court, however, is that a different contract was in effect at the time of Alexander's death. The contract interpreted in the *Martin* case provided that: "[The United States and Day & Zimmerman] *in their endeavor to maintain the maximum degree of safety will cooperate in all regards in the administration of the safety program* and in developing and applying as mandatory those provisions of said [safety] Manual which are consistent with the Plant structure, facilities and personnel resources, when mutually agreed upon by the parties hereto"[4] (emphasis added). Language regarding a cooperative endeavor to administer the plant's safety program is conspicuously absent from the contract executed by Day & Zim-

merman and the United States in 1971. Under the explicit terms of the 1971 contract, plant safety was solely Day & Zimmerman's responsibility; there was no joint endeavor, venture, or enterprise. Although the government retained the authority to monitor compliance with the contract, Day & Zimmerman operated the plant as an independent contractor.

The Federal Tort Claims Act subjects the United States to liability for personal injury or death caused by "the negligent or wrongful act or omission of any employee of the Government . . .". 28 U.S.C. § 1346(b). " 'Employee of the government' includes officers or employees of any federal agency . . .." *Id.* at § 2671. " 'Federal agency' includes the executive departments and independent establishments of the United States . . . but does not include any contractor with the United States." *Id.* Thus, the statutory rule under the Federal Tort Claims Act is that the United States is not liable for the negligence of a government contractor.

*United States v. Orleans*, 1976, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390, decided after the *Martin* case, supports this position. In *Orleans* the Supreme Court held that a party under contract with the government becomes an agency of the United States within the meaning of the FTCA only if the United States supervises day-to-day operations of the party. If day-to-day supervision over the independent contractor exists, the contractor is deemed an agency of the federal government and the United States is liable under the FTCA for injuries caused by negligence of the independent contractor's employees. The critical question, said the Court "is not whether the . . . agency receives federal money and must

and construction codes. Both the Government and the Contractor agree and recognize that the plant turned over to the Contractor under this contract was planned and constructed prior to the promulgation of the current AMCR 385–100, Safety Manual, dated April 1970, that it now provides for a degree of safety normally and customarily expected in operations involving manufacture, handling, storage and transportation of explo-

sives and munitions, and that it is generally acceptable to the parties hereto in its existing state as a plant for the purposes described in this Contract.

4. Article VI–F of the contract executed by Day & Zimmerman and the United States in effect on August 28, 1961 and construed in *Martin v. United States*, No. 794 (E.D.Tex. Aug. 7, 1964), *aff'd per curiam*, 5 Cir. 1966, 354 F.2d 686.

comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government". 425 U.S. at 815, 96 S.Ct. at 1976. The authority exercised by the United States under its safety program at the Lone Star plant could not be said to constitute day-to-day supervision of Day & Zimmerman's operations, but was only a means of monitoring compliance with the contract and with government safety regulations. Accordingly any liability of the United States for Alexander's death may rest only on direct negligence of United States employees and not on negligent conduct of employees of its independent contractor, Day & Zimmerman.

In a similar case, *United States v. Page*, 10 Cir. 1965, 350 F.2d 28, *cert. denied*, 1966, 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470, the United States had entered into a contract with the Hercules Powder Company for the manufacture of solid fuel propellants for model experimental rockets to be used by the United States government. Under its contract with the Hercules Powder Company, the United States retained authority to inspect and supervise the safety of operations at the Hercules Powder plant that was similar to the authority retained by the United States in its contract with Day & Zimmerman. The Tenth Circuit in discussing the liability of the United States under the Federal Tort Claims Act for the death of an employee of the Hercules Powder Company at the plant stated: "The fact that the contract may have reserved to the United States the right to inspect the work and facilities of the independent contractor [Hercules Powder Company], and the right to stop the work, does not in itself override or alter the general rule of nonliability for the torts of the contractor . . .". *Id.* at 30. *See also Perez v. United States*, 1 Cir. 1979, 594 F.2d 280, 283–85; *Gibson v. United States*, 3 Cir. 1977, 567 F.2d 1237, 1242–43, *cert. denied*, 1978, 436 U.S. 925, 98 S.Ct. 2819, 56 L.Ed.2d 768; *Market Insurance Co. v. United States*, 5 Cir. 1969, 415 F.2d 459, 462–63.

Counsel for the plaintiff vigorously asserts that *Orleans* simply states the general rule of law that the United States cannot be held vicariously liable for the acts of an independent contractor; that he has no quarrel with this principle; that the plaintiff's theory of government liability rests on the negligence of government employees who breached a duty to the decedent. But *Orleans* and related cases, decided more recently than our per curiam decision in *Martin*, bear directly on the status of the general contractor: whether a safety program and the government's monitoring of it converts an independent contractor into some kind of joint venturer with the government. In view of the absence of any day-to-day control over the contractor's operations there is no basis for finding, contrary to the contract, that the United States was in a "joint endeavor" with Day & Zimmerman. *Cf. United States v. Page*, 10 Cir. 1965, 350 F.2d 28, 31.

## III

■ Still, the plaintiff contends and the district court held that the accident was caused by a breach of a duty of care owed the decedent by United States employees. Under Texas law a person having work or services performed by an independent contractor generally is not liable for injuries sustained by employees of an independent contractor. *Allen v. Texas Electric Service Co.*, 350 S.W.2d 866, 867 (Civ.App.Tex.1961). The Texas rule of nonliability does not apply, however, where the work performed under the contract is inherently dangerous as a result of circumstances brought about by the employer or where the employer retains control over the operative details and the right to direct the manner in which employees of the independent contractor perform their work. *Id.* at 867–68 (citing *Sun Oil Co. v. Kneten*, 5 Cir. 1948, 164 F.2d 806, 809). Neither theory, however, warrants recovery in this case.

■ Under Texas law, one engaging an independent contractor to perform inherently dangerous work has a nondelegable duty to assure that the work is performed safely. *H.M.R. Construction Co. v.*

*Wolco of Houston, Inc.*, 422 S.W.2d 214, 217 (Civ.App.Tex.1967); *Cage v. Creed*, 308 S.W.2d 78, 80 (Civ.App.Tex.1957); *Randle v. Naugle*, 299 S.W. 297, 300 (Civ.App.Tex. 1927). Under the Texas version of the inherently dangerous activity doctrine, negligence of an independent contractor which causes an injury to a third party is imputed to the employer of the independent contractor. *Id.* Active negligence of the employer is immaterial assuming, of course, that the employer is not in actual control of the premises or the dangerous activity. The district court, citing *United States v. Babbs*, 9 Cir. 1973, 483 F.2d 308, held that the inherently dangerous activity doctrine permits recovery in this case. The *Babbs* court in granting recovery under the FTCA, applied the California rule that an employer of an independent contractor engaged in intrinsically dangerous work has an independent nondelegable duty to assure the safety of the independent contractor's employees. *Id.* at 314. In California, however, an employer is liable for his *own* acts of negligence in failing to exercise his affirmative duty of care for the independent contractor's employees and not simply the imputed negligence of the independent contractor. *Id.* (citing *Van Arsdale v. Hollinger*, 68 Cal.2d 245, 66 Cal.Rptr. 20, 437 P.2d 508 (1968)). In this case the district court cited no Texas decisions applying the inherently dangerous activity doctrine in a fashion similar to California. While Texas permits vicarious liability under the inherently dangerous activity doctrine, Texas recognizes no affirmative duty running to the employees of an independent contractor performing inherently dangerous work in a case such as this where the independent contractor is in possession and control of the premises on which the work is performed.[5] Since the United States is only liable for the active negligence of its employees under the FTCA and not for the imputed negligence of an independent contractor, the plaintiff may not recovery damages under the Texas inherently dangerous duty doctrine. *See* 28 U.S.C. § 1346(b); *Emelwon, Inc. v. United States*, 5 Cir. 1968, 391 F.2d 9, 10; *United States v. Hull*, 1 Cir. 1952, 195 F.2d 64, 67.

■ Texas also recognizes an exception to the rule of nonliability of an employer of an independent contractor in situations where the employer retains control over operative details and retains the right to direct the manner in which the employees of the independent contractor perform their work. In such cases, the employer is liable for his own failure to exercise reasonable care for the safety of the independent contractor's employees. *Allen v. Texas Electric Service Co.*, 350 S.W.2d 866, 867–68 (Civ.App.Tex.1961). An employer must exercise care, under such circumstances, commensurate with the degree of control exercised over the independent contractor.[6]

## IV

■ Even assuming that the United States had a duty of care to Alexander,

5. In *Galveston-Houston Electric Ry. Co. v. Reinle*, 113 Tex. 456, 258 S.W. 803 (1924), *overruled, Delhi-Taylor Oil Corp. v. Henry*, 416 S.W.2d 390 (Tex.), *cert. denied*, 1967, 389 U.S. 1021, 88 S.Ct. 592, 19 L.Ed.2d 667, the Texas Supreme Court recognized that an individual in control of premises who hires a contractor to perform work which exposes the contractor's employees to dangers inherent in the premises has an independent duty to warn the employees of the contractor of the dangerous condition. 258 S.W. at 805. *Delhi-Taylor* did not abolish the rule that an owner in control of premises owes a duty to employees of an independent contractor to take reasonable precautions to protect them from hidden dangers on the premises or to warn them of the danger, but held only that an adequate warning to or full knowledge by the independent contractor of the dangers was sufficient to discharge the owner's duty to warn the employees. *Delhi-Taylor Oil Corp.*, 416 S.W.2d at 392, 394.

6. The rule that an employer of an independent contractor must exercise care commensurate with a degree of control exercised over an independent contractor is embodied in the Restatement (Second) of Torts § 414 which states: "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care".

there is insufficient evidence in the record to support a finding that an act or omission on the part of United States employees was a proximate cause of Alexander's accident. Instead, our review of the record persuades us that the sole proximate cause of the accident was the decedent's own negligent failure to comply with the standard operating procedure for detonating faulty grenades (SOP I–55).

The district court's findings of negligence related to the design of the protective steel barricade at the test site, the defect in the safety mechanism on the grenade testing apparatus, the failure of the United States to provide Alexander with protective clothing, equipment, or operational shields, the government's approval of SOP I–55 governing the procedure to be used in detonating faulty grenades, and the government's alleged failure to conduct a proper system safety analysis of SOP I–55. Despite the district court's many findings of negligence, the evidence is clear that had Alexander followed the prescribed detonation procedure the accident would not have occurred. Had SOP I–55 been followed, for example, the defect in the testing apparatus would have posed no threat to Alexander's safety. In addition, protection which might have been afforded by special clothing, operational shields, and equipment would have been unnecessary, had Alexander taken advantage of the complete protection of the steel barricade as required by government regulations. Finally, whether the government conducted an adequate system safety analysis of SOP I–55 is immaterial, in the absence of proof that the detonation procedure was defective.

In focusing our inquiry on SOP I–55, we are unable to find sufficient evidence of a defect to justify a finding of active negligence on the part of the government. The standard operating procedure governing the detonation of faulty grenades required Alexander to follow a detailed and time-consuming series of steps. After being notified of a misfire, Alexander was required first to receive permission from a Day & Zimmerman division head to approach the test site. After receiving permission to approach the test site, Alexander was required to examine the testing apparatus through a viewing window on the protective steel barricade. After determining the cause of the misfire Alexander was required to return to the control building and lock the demolition circuit box to prevent an accidental discharge of the grenade. Next Alexander was to return to the barricade and place an explosive compound next to the grenade by reaching over the barricade with a pole and lanyard and lowering the charge onto the testing apparatus. Finally, SOP I–55 dictated that Alexander return to the control building and explode the charge at a safe distance from the grenade.

Alexander disregarded each step of SOP I–55. First, he approached the test site without receiving permission from his division head to detonate the grenade. Alexander then went on the unsafe side of the protective steel barricade to determine the cause of the misfire. The district judge concluded that Alexander had abandoned the safety of the barricade because the viewing window was too small and placed too high for proper viewing of the testing apparatus. The window was small, but the evidence was that the window was adequate for its intended purposes and was not defective because of its size or location. After leaving the barricade Alexander attempted to reset the firing mechanism on the testing apparatus in clear contravention of SOP I–55 which required that the grenade be destroyed in place by means of an explosive compound.

We do not question the district court's finding that the SOP I–55 was time-consuming and cumbersome. The district court was clearly erroneous, however, in holding that the procedure was therefore defective. In view of the danger of working in the vicinity of hazardous munitions the government was justified in requiring that Alexander follow the elaborate and detailed detonation procedure while standing behind the protective steel barricade. Alexander's disregard for SOP I–55 and for the complete safety afforded by the protec-

tive steel barricade cannot be justified on the ground that the detonation procedure was not simple to carry out. The Army panel which investigated the accident and the witnesses at the trial agreed that had Alexander stayed behind the steel barricade and followed SOP I–55 the accident would not have occurred. Since SOP I–55 was not defective, it is unnecessary for us to resolve the question whether the government actually conducted the various system safety analyses of SOP I–55 required by Army regulations.

We hold that the sole proximate cause of the accident was the decedent's negligence in failing to comply with SOP I–55.

REVERSED.